Okay. Two more to go. Isom v. Palmeri. Ms. Boranko. Good morning. Good morning. Glad to be here in person. We're glad to have you in person and we're glad to be here in person too. Absolutely. May it please the court. My name is Summer Boranko. I'm here on behalf of the appellant, Deputy Joseph Palmeri, as well as the two cross appellees, Detective Paul Bulso and Sheriff Wells. I know there was an issue about jurisdiction on both sides of this case, and I wasn't sure if your honors wanted me to address that initially or if you wanted me to go right into my substantive argument. I think you can get to the heart of your argument. If we have any questions about jurisdiction, we'll ask them. Thank you. Thank you. I know time is of the essence. Essentially, at the core of this case for Detective, or actually it's Deputy Paul Palmeri and his appeal, is the fact that the trial court denied him qualified immunity. Essentially, this case and the evidence that is in the record at worst establishes that Deputy Palmeri mistakenly identified Mr. Isom as the person that fled from him during a traffic stop on April 1st of 2014. It seemed to me one problem with what the district court did was the district court discounted whether Palmeri saw the suspect's face. It seemed to me that there's undisputed evidence that Palmeri did because Palmeri told the dispatchers at the time of the chase that the suspect had gold teeth. I don't know how Palmeri could have concluded that without seeing the face. You're absolutely right, Your Honor. Yes, that is true. That is one thing that the trial court told us. Furthermore, the trial court itself said something like this. He said that the officer, Palmeri, situated himself in front of the suspect and apparently the suspect was walking toward Officer Palmeri for just a little while. Palmeri told him to turn around. He didn't say turn around. He said, get back in your truck. He turned around and walked back toward his truck and then Palmeri approached him from the rear. He had that opportunity to see the face before he turned around and went back toward the truck. Then again, when the suspect spun around, the district court said, and hit Palmeri's hand, so he had an opportunity again to look at the face. It seems to me at least two opportunities. Yes, Your Honor. That's absolutely true. I believe Deputy Palmeri testified that he did get a chance to see the man's face on at least two occasions for about five seconds each time. That is undisputed, Your Honors, as you pointed out, because Mr. Isom's contention is that he was not there at the traffic stop. There really is no way for Mr. Isom to dispute what Deputy Palmeri says happened. That does sound to me a lot like we're talking about whether there's a disputed question of material fact, though, right? Well, I think, Your Honor, that you do get to that point. Obviously, there are issues in this case that relate to fact. But it's our position that the main issue, which is an issue of law, is whether or not Deputy Palmeri is entitled to qualified immunity, as there was at least arguable probable cause for Mr. Isom's arrest based on Deputy Palmeri's identification within 30 minutes of the traffic stop of Mr. Isom. And the trial court took issue with the reliability of Deputy Palmeri's identification, critiquing it, as Chief Judge Pryor mentioned, in terms of not putting in his report that he saw the man's face specifically, although the record is undisputed, that he identified this person as a black male, 6'3", with gold teeth. I know one of the issues that the other side, Isom, attempts to raise a dispute in the facts in regard to the fact that Mr. Isom testified that he never had gold teeth. But the issue here, Your Honors, as I'm sure you're aware, is not whether or not Mr. Isom was the one that actually fled from Deputy Palmeri, but whether or not it was reasonable for the officer to believe that the proper person was identified. And that goes also in regard to the cross-appeal against Deputy or Detective Bolso. Everything stemmed from Deputy Palmeri's, at least at the time that the warrants were pulled, both in state court and federal court, Deputy Palmeri was 100% sure that he identified the proper person. I assume that the three pictures of plaintiff that were in the Intel bulletin did not show his teeth. Is that correct? That is correct, Your Honor, and those pictures are in the record. Yes, Mr. Isom was not seen smiling in any of the pictures or showing his teeth. So Deputy Palmeri had no, you know, no reason to know one way or the other whether or not Mr. Isom had gold teeth, didn't have gold teeth. And frankly, gold teeth, as is argued in the briefs, is, at this age, is really almost like a fashion statement. It doesn't have to be a permanent fixture. It can be a gold grill, something that's removed from someone, unlike, say, someone's gender or the color of their skin. It's something that was changeable, such that it was reasonable, even if, after the fact, Deputy Palmeri learned from other law enforcement officers that Mr. Isom had a brother and, gee, maybe I was wrong with this identification. At worst, that would be a mistaken identity and would not be something that would rise to the level of a constitutional violation. Is it undisputed that at the time that Palmeri made the identification, he did not know plaintiff and did not know that plaintiff did not have gold teeth? That is correct, Your Honor, and that is undisputed in the record. Bolso may have had some contact with the plaintiff earlier, but not Palmeri. That's correct, and Detective Bolso, it's undisputed, was not present during the April 1st traffic stop of Mr. Isom. This is one of those situations where one deputy knew some information, another deputy knew other information, and Detective Bolso was entitled to rely on his fellow law enforcement officers' certain identification of Mr. Isom. So that, we believe, it's our position that the trial court erred in not granting qualified immunity for Deputy Palmeri in regard to the malicious prosecution claim. Also, to the extent that Your Honors were to find that there is jurisdiction to entertain the cross appeals in this case, as I just mentioned, Detective Bolso— Could I ask you one thing before you get to the cross appeal? Absolutely. The district court also relied on what he referred to as the false statement by Palmeri with respect to the dogs leading the officers to plaintiff's house. How do you respond to that? Well, a couple of ways, Your Honor. Number one, Deputy Palmeri's report was accurately reflected that the canine went back to, I believe it was 5724, which was the house across the street. Right. Although Mr. Isom, according to the NCSO Intelligence Bulletin, was known to reside at 5723. So Deputy Palmeri, in his report, got it accurately down. He wasn't—to me, that's evidence that does not make any sense. Do we know the route that the dogs took, in other words, from the scene where the dogs were following the scent? They might have gone right by plaintiff's house, over then next door to the drug house—I mean across the street to the drug house. Do we know that route or not? I do not believe that's in the record specifically, Your Honor. I would say, though, that Deputy Palmeri testified that he was familiar with this area. And to him, there were four—based on his training and experience, there were four homes, two together on each side of the street, that were all involved in drug trafficking. So that, to him, 5723, 5724 didn't make much of a difference because they were all intertwined. And I see that I'm out of time. I know I've reserved five minutes for rebuttal. Okay. Ms. Barranco, you've saved five minutes for rebuttal. Mr. Huggins. Mr. Huggins, you self-administered this morning? Yes, sir. And it returned negative? Yes, sir. You realize now what our general order provides? Yes, sir. Let's try to make sure we don't have that happen again. May it please the Court. Thank you. Arthur Huggins on behalf of Plaintiff and Appellee Marty Isen. I believe that this Court should conduct its own analysis of the facts as the record reveals that there is inconsistent testimony amongst the officers, that being Deputy Palmeri, Detective Pulso, as well as Deputy Bogart, who responded to the scene as well. In regards to the undisputed fact that Palmeri was able to see the person's face that was fleeing from the vehicle, we can see that Markey Isen was not there present during the traffic stop, but there is also the police report that we can rely on as far as the facts that happened on that night. Well, it says that the report says only that the suspect walked away, but there's nothing in the report that says that Palmeri would not have seen his face. Yes, Your Honor, but if you take the words that were construed on the report, it clearly says that he walked away. So if you're walking away, then there's no point if you're conducting a traffic stop. It is undisputed that Palmeri had told the dispatchers that the suspect had gold teeth, right? Yes, Your Honor. Couldn't have done that without having seen his face, could he? Well, unless he was being untruthful about what he saw. Say that again. Unless he was being untruthful about what he actually saw. Like I said in his report. But where's the evidence that he's being untruthful? Just the mere fact that the report said that he walked away, that the suspect walked away? Well, and the fact that he didn't include that in his report. Does Mr. Isom have gold teeth? No, he does not. And then I also want to point out that the day after that Marquis Isom was arrested, Palmeri actually went and sought out Mr. Isom. And I believe that you can infer that he went to seek out Mr. Isom to see if he was actually identifying the correct person. So in that communication, in that confrontation, he had the ability to ascertain if Mr. Isom actually had gold teeth or not. How would he do that? The day after that Mr. Isom was arrested, Deputy Palmeri went and confronted Mr. Isom about being released. So they had a conversation face to face. And at that time he would have been able to identify had Mr. Isom actually had gold teeth or not. So your suggestion is he should have then raised doubts right then rather than waiting a little while. Exactly, the day after. And there's case law, and we rely on Kingsland, that officers' actions during and after the arrest provided circumstantial evidence that the officers fabricated the evidence. So if we look at the actions after the arrest affidavits were effectuated, you see that then Mr. Palmeri goes directly to Mr. Isom to ascertain his identification and to see if his identification was actually correct. Of course, at this point he's seen the photograph, is that right? He's seen the photograph. Mr. Isom has been arrested initially. Yes, so what he would see when he sees him is what he saw in the photograph, the same person. Is that he would see the photograph? I don't think that helps you. Well, in regards to the gold teeth, he was able to identify that Mr. Isom did not have gold teeth. Right. Which means what he reported to the dispatcher, he does not fit the description. So at that time he could have revealed that, hey, I may have got this wrong. Well, he omitted the gold teeth from the report. My understanding is he wrote out the written report late the same day of the arrest, correct? Yes, Your Honor. And it wasn't until the next day he went and saw the plaintiff, you're saying. So he didn't know at the time he left out the gold teeth. He didn't know that that would be significant. He had no idea that plaintiff did or did not have gold teeth. Well, he should have known that it would be significant if he's making an identification of a person. So in his report he would have included, hey, I actually saw the suspect's face, and this is the distinction. His report, though, did say that the driver swung his arm and hit him, right? Correct. That he spun and struck his hand, right, which would suggest that he would have seen the suspect's face. Well, not necessarily so. In regards to the facts of the report, he's saying that the driver got out of the car and started to walk away from him. So if I'm walking away, the only thing you can see is my back. And at the point that he was able to pursue and get up on him, that's when I guess the swing of the- Spun and struck, right? Spun meaning turn around, right? Correct. In which case you would see the front. In which case, yeah, you may see the front not knowing that you may see his face or you may have looked at his body from the contact of the arm. So within those five seconds, I don't know who's to say that they saw his face or not. As I stated- Counsel, let me ask you this question and give you time to straighten me out if I'm wrong. It seems to me that there is really very, very substantial evidence of probable cause here, such that- and possibly the error about the dogs leading the officers to plaintiff's house just don't measure up as indicating that there is any. Here we've got to find intentional or reckless misidentification. Is that not true? That's the test?  Okay, and here is the evidence. You've got Palmyra knowing at the time he made the identification that the suspect was driving a car that belonged to plaintiff's mother. So he knew that plaintiff had access to that pickup truck. He knew that plaintiff had access to that drug house where the drugs, where he thought the drugs came from because he lived right across the street. The intel bulletin showed him that. He knew that the dogs led the officers to that vicinity. Now, there's some dispute about whether he at one point told Bolso that it was plaintiff's house. But in any event, it's that vicinity, which even if that's an error, it adds a little something to the evidence. And then he identified the suspect as 6'3", and plaintiff was a black male, 6'4". And then finally, as we've been talking about, he did get a chance, it seems to me, he got a chance to see the face. We know that for all the reasons we've been talking about. And he then saw three photographs of the plaintiff, and he was 100% certain. He was very confident. And we also know, and this I think is evidence that we can consider, that he looks very much like his brother. So it seems to me that is very strong evidence of probable cause. And all you've got to suggest intentional or reckless misidentification is omitting gold teeth from the report. And number two, saying the dogs led us to plaintiff's house rather than led us to the house across the street. Okay. Your Honor, to address the access to the pickup, you said that he, I guess he had evidence that there was some access to the pickup truck. Well, the pickup truck's owned by his mom. The pickup truck is owned by his mom, but there's no testimony that Mr. Isom drives his mom's car at any time. Not only that, anybody that's related to his mom could have access, i.e., his brother. Not only that, the bulletin that suggested that Mr. Isom lived at that address was not vetted. Clearly, Lieutenant Thomason said that the reason why Mr. Isom was listed on that intel bulletin was because an unknown informant said that the person that lived there was going by the name of Benoit. And that's how he attributed Isom to live and reside in that area. Essentially, Palmieri would convene in that area. He would always observe that area. He said that any time that he would have free time, he would go to that street and watch it. At no time had he ever saw Marquis Isom in that area prior to this event. And then in regards to— The bulletin warned that Isom was armed, right, and that his criminal history had prior convictions for fraud in obtaining medicinal drugs, driving while licensed suspended battery on a law enforcement officer in possession of cocaine. And so this officer, Palmieri, confronts him and is attacked by the suspect. The suspect's pickup truck has a gun, medicinal drugs, and cocaine, all of which is consistent with the bulletin. The bulletin was fabricated, Your Honor, in regards to the reliability of the bulletin. But there's no evidence that Palmieri knew the bulletin was fabricated, is there? Well, the bulletin actually says on it that it's not reliable. The bulletin actually has those words on there. It's not a reliable information. It's just there for informational purposes that somebody identified that there's a person that lives in this area that's going by Benoit, but they never identified that Benoit was Marquis Isom. So in other words, anybody could have been going by the alias Benoit. It could have been any individual, but that individual was never identified as Marquis Isom, if you understand what I'm saying. I don't completely understand. Where are you saying that the connection between Benoit and Mr. Isom happens? So, it's record in Manatee County Sheriff's Office that Marquis Isom has gone by the alias Benoit. So when they heard Benoit, they attributed that name to Marquis Isom, and that's why he was listed as the person that resided there. But there's no other evidence that he ever resided there. As I said, Palmieri, that was where he went to look for crime, and he's never seen Benoit there. Deputy Bogart has never seen Benoit in that area. So I agree with the lower trial court that the identification is highly suspicious. Had it not been for the trunk belonging to his mother, then Marquis Isom would have never even been brought up as a suspect. So in regards to his relationship to his mother, I believe that was highly suggestive that he was the suspect, and that's what Palmieri relied on. You have to take into account that Palmieri was evaded by the suspect. It caused a little bit of embarrassment to him in regards to all of the officers that had to come out and the tracking, and that his supervisor was out there, and that he actually was up on the suspect. He could have apprehended him, but as he said, he made the mistake in giving him the benefit of the doubt. So in other words, he would have needed to come up with some suspect after the suspect had fled away from him. In regards to, again, his report, it's the strongest evidence in regards to what he saw on that night. He never identified any characteristics besides the gold teeth, and it just simply does not fit the description of Marquis Isom. In other words, the only thing he relied on was the stature. I mean, how many black males that are walking around that are 6'3"? There's no distinctive features that he relied on to identify Marquis Isom. You've suggested that there perhaps was fabrication or a grudge. Is there any reason that Mr. Palmieri would have a grudge against your client and not against his brother? Is there any theory for why? As I stated in my brief, there's a prior investigation that took place in which Bousso was investigating both brothers, and at the time, they were only able to arrest Mr. Simmons. They were not successful in— What about Palmieri? Palmieri, again, he's working with Bousso. But I thought there was no evidence that Palmieri had anything to do with that prior contact that Bousso had with Plaintiff and the brother. Right. There's no evidence that he had the prior—but again, right after the arrest, he did go and make contact with him. And I think it's important— The next day, not right after, but the next day. The next day. But it's important that the proceeding continue. They never revealed that Palmieri was recanting the statement, which he did. He backed off the statement. The exculpatory evidence—it's undisputed that Mr. Isom was not driving the vehicle on that day. The evidence is exculpatory in regards to the fingerprints and in regards to the DNA. The only thing that corroborates Mr. Palmieri's account that Isom was identified that night is the intel bulletin and the fact that he's related to his mother, whose vehicle was on the scene. There's no exceptions. Any other questions? Okay. Mr. Huggins, your time has expired. We appreciate it. You were answered a question from the court. Ms. Branco? Thank you. I was just taking a few notes while Mr. Isom's counsel was up here. One thing I wanted to point out is Mr. Isom testified that he used the name Benoit. So to the extent there's any question about that—and I would point your honors to the record at 65-4, page 7. That's Mr. Isom's deposition, lines 3 through 21, where he admitted to using the name Benoit. Essentially, as I said before, whether or not Mr. Isom was actually the guy who fled from Deputy Palmieri, I think your honors realize that's not the question. Additionally, the issues about Deputy Palmieri backing off of his identification later, the issue about fingerprints— The question is whether there was an intentional or reckless misstatement here, right? Correct, your honors. And just as your honors ruled, I know Chief Judge Pryor had authored the opinion in Williams v. Aguirre last year talking about Section 1983 malicious prosecution claims and specifically noting that just a negligent or a mistaken statement is not going to make up a constitutional violation. Right. The only other thing I wanted to mention was in terms of the evidence against the sheriff on the 1983 Monel claim. If your honors were to find jurisdiction as to Isom's appeal with regard to the sheriff, the only count that was brought against Sheriff Wells was in Count 5, which was a Monel claim. And as is argued in— Of course, if you're right about the district court having erred with denying Palmieri qualified immunity, that takes care of everything, doesn't it? Essentially, yes. Yes, absolutely. Well, actually, it doesn't necessarily take care of the claim against Palmieri for State law malicious prosecution unless we treat that as inextricably intertwined with the Federal. You've got no State law immunity, so that's not immediately appealable on its own. The district court held you waived that. Held that, yes, Palmieri waived that, and therefore it's not appealable on its own. But, of course, it probably is inextricably intertwined. Well, Your Honor, I'm not sure I understood exactly what you said. I think what Judge Anderson's mentioning is the jurisdictional component of whether we have the State law immunity issue. Right. And if the State law malicious prosecution claim is inextricably intertwined with a Fourth Amendment claim, then we have jurisdiction. If not, then we would not have jurisdiction over that, the denial of State law immunity for that claim. What I understand, Your Honor, and thank you for that clarification, was that it's Deputy Palmieri's position that he did not waive the argument of immunity on the State law malicious prosecution claim. I know that the trial court stated that because it was only mentioned in passing, that argument in a footnote, that Palmieri waived it. However, it's our position that in the reply brief, it was more fully set, or the reply to the summary judgment motion was more fully vetted out in the argument, and so our position is that Deputy Palmieri did not waive the immunity issue. However, I would agree with Judge Anderson that to the extent Your Honors were to find, as the trial court did, that Palmieri waived that argument, I would submit, as it was argued in the briefs, that the issue of the State law immunity on the malicious prosecution claim for Palmieri is inextricably intertwined with his immunity on the 1983 malicious prosecution claim, and we would ask that this court enter judgment, reverse and remand Judge Scriven's order in regard to denying Deputy Palmieri both qualified immunity on the 1983 malicious prosecution claim, as well as essentially denying him his immunity under 768.28 subsection 9 on the malicious prosecution claim. That was actually, I have a quick follow-up question on that. I thought that the district court said that the State law immunity claim would likely fail. Do you see that as a conclusive determination? I do recall, Judge Grant, that the judge did mention that in passing. And if you were to find that that was a conclusive finding against Palmieri, I think, frankly, that would further bolster this court's jurisdiction over that issue. And just as the panel in your questions earlier stated that there needs to be evidence in the record of recklessness, bad faith, so too it's Palmieri's position that he would be entitled to State law immunity because there was no evidence in this record, just conclusory allegations, that he had acted in bad faith in identifying Mr. Isom, someone who it was undisputed, he did not know beforehand and had no reason to make up something like that. And I see my time is out. I'll go over. Okay. Thank you, Ms. Branko. We'll move to our last case for today.